**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **KELLY RENEE PELICAN-REED** | * | **CIVIL ACTION NO. 6:14-cv-00783** |
| | * | |
| **VERSUS** | * | **JUDGE REBECCA F. DOHERTY** |
| | * | |
| **POLICE DEPARTMENT OF THE CITY OF OPELOUSAS, ET AL.** | * | **MAG. JUDGE C. MICHAEL HILL** |
| | * | |

**DECLARATION OF LORETTA ETIENNE**

Pursuant to 28 U.S.C. § 1746, the undersigned, Loretta Etienne, declares under penalty of perjury that the following statements are true and correct:

1. I am presently, and have been since 1993, a commissioned police officer with the Opelousas Police Department. My current rank is Sergeant.

2. From time to time, Nolan J. Noel, the owner of Opelousas Skate Center a/k/a Skatz Skating Rink (the "rink"), hires me and other off-duty police officers to work a security detail at the rink. Mr. Noel has informed us that, if we observe a patron engaging in any rowdy, unruly, or threatening behavior, we have his permission to direct the patron to leave the rink. Any patrons who refuse to leave the rink, after we direct them to do so, do not have Mr. Noel's permission to be in his place of business.

3. On October 12, 2013, while Lt. Rodney May, Pfc. Romalis Curtis, and I were all working a security detail at the rink, I observed a group of approximately eleven patrons near the girl's bathroom and overheard several of them talking about fighting. At about the same time, I observed a smaller group of patrons, which included Kelly Pelican-Reed's son, standing against the wall on the right side of the building. A short time later, I told Lt. May what I had observed

EXHIBIT
tabbies
A

and overheard. Lt. May, Pfc. Curtis and I decided to position ourselves near the smaller group to make sure a fight did not break out.

4. While I was observing them, the larger group of patrons began walking around the rink, passing by the smaller group of patrons several times as they stood against the wall. On one such occasion, a member of the larger group, Kaman Aggison, stared at the smaller group. Later, when the larger group walked past the smaller group about the fourth time, Mr. Aggison peered at the smaller group as though he wanted to fight them.

5. Mrs. Pelican-Reed's son and another member of his group began walking around the rink in the opposite direction. The two continued walking until they encountered the larger group ("Mr. Aggison's group"), which, by then, had walked completely around the rink from the other direction.

6. At this point, Lt. May, Pfc. Curtis, and I felt there was a significant risk of a fight breaking-out so we directed everyone in Mr. Aggison's group to call their rides and go home. I directed Mrs. Pelican-Reed's son to go back to the area where he had been standing against the wall in order to keep him a safe distance away from Mr. Aggison's group while they called their rides.

7. As members of Mr. Aggison's group were standing at the counter near the rink's entrance waiting on their rides to go home, I observed Mrs. Pelican-Reed's son walk across the floor with a pair of skates in his hand. When Mr. Reed arrived at the counter, he put the skates on the counter, turned towards Mr. Aggison's group, and made a taunting gesture at them with his hand, which appeared as though he wanted to fight them.

8. After observing Mr. Reed make the taunting gesture, I told him to come over to me. When Mr. Reed got close to me, I told him to call his ride and go home. He became very

upset with me; he was talking loudly, arguing and cursing. I told him several times to keep his voice down, but he refused. I told him to call his ride and go home a second time, but, again, he refused. I then grabbed the sleeve of Mr. Reed's right arm and advised him that, if he continued to disobey me, he would be arrested. Despite this warning, he continued yelling, cursing, and offering resistance by pulling away from my grasp.

9. Mr. Reed is taller and heavier than me. As I was trying to restrain him, Lt. May came over to assist me. While we were struggling with Mr. Reed to restrain him, I accidently scratched Mr. Reed on his neck with my one of my fingernails.

10. To restrain Mr. Reed, Lt. May placed a rear arm bar lock on him—a technique that involves holding a suspect's arm behind his back—and escorted him over to the counter near the rink's entrance. Lt. May held him against the counter until he stopped resisting. Lt. May did not twist or raise Mr. Reed's arm up above his head. Nor did Lt. May slam his face into a wall or the counter.

11. Mr. Reed was escorted out of the rink and told to remain on the porch until he calmed down. We decided not to arrest Mr. Reed at that time, provided he agreed to leave the rink. Mr. Reed was allowed to go back inside the rink to call his mother for a ride home.

12. Soon after Mr. Reed re-entered the rink, Lt. May and I heard a lot of cursing and yelling. We ran back inside the rink, where we encountered Mr. Reed and Mr. Aggison, and we overheard Reed ask Aggison if he wanted to fight.

13. At that time, Mr. Reed and Mr. Aggison were taken into custody and placed under arrest. Both were charged with disturbing the peace by loud and abusive language. Mr. Reed was also charged with resisting an officer.

14. Mr. Reed and Mr. Aggison were transported to police headquarters, where they were each booked. A short time later, Mr. Reed was released to his mother's custody.

15. Lt. May and I used only the amount of force that was necessary to overcome Mr. Reed's active resistance.

Executed on the 6th day of October, 2014.

LORETTA ETIENNE